* * * * * * * * * * *
The undersigned reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Taylor. The appealing party has shown good ground to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. Having reviewed the competent evidence of record, the Full Commission rejects the findings of fact in the Opinion and Award of Deputy Commissioner Taylor and enters the following Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. Employee is Stephanie Hardy.
 2. Employer is MasterBrand Cabinets. *Page 2 
3. Gallagher-Bassett is the servicing agent on this claim.
4. Defendant regularly employs three or more employees and is bound by the provisions of the North Carolina Workers' Compensation Act.
5. The Industrial Commission has jurisdiction over the parties, and all parties have been properly named in this action.
6. The parties stipulated into evidence as, Stipulated Exhibit 1, the following: Industrial Commission forms, medical records, personnel file, and MSD sheets.
7. Plaintiff contends that the contested issues to be decided by the Industrial Commission are the following:
 a. Whether plaintiff suffered an occupational disease arising out of and in the course and scope of her employment on September 26, 2003?
 b. If so, to what benefits is plaintiff entitled?
8. Defendants contend that the contested issues to be decided by the Industrial Commission are the following:
 a. Whether plaintiff suffered an occupational disease arising out of and in the course and scope of her employment on September 26, 2003, including whether plaintiff's claim is barred by the statute of limitation or lack of notice?
 b. If plaintiff did sustain a compensable occupational disease as alleged, what benefits, if any, is employee-plaintiff entitled to?
 * * * * * * * * * * *
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following: *Page 3 
 FINDINGS OF FACT
1. At the time of hearing, plaintiff was a 37-year-old female, born November 8, 1969.
2. Plaintiff worked for Lowes from April 1994 to December 1998 during which time she obtained an Intermediate Paint Certification. Plaintiff testified that from 1995 forward she was an assistant manager at Lowe's over four departments including the paint department.
3. Plaintiff began her employment with defendant, who manufactures kitchen and bathroom cabinets, on March 6, 2000 and was assigned to the shipping department. Plaintiff became the shipping department supervisor in July 2000 and remained the department supervisor until February 2003 when she was moved into the position of Receiving Department Supervisor.
4. As supervisor in the shipping department, plaintiff had an office that was freestanding with air conditioning and heating separate from the factory floor. The Shipping Department was located on the far end of the factory and contained 15 open truck bays as well as fans.
5. Plaintiff was responsible for making sure products were packaged and properly loaded on trucks to customers. Plaintiff supervised four lead persons. A lead person was responsible for checking paperwork and making sure that the appropriate cabinets are placed on the appropriate truck and ensuring that all cabinets or parts were ready and available for shipping. Two parts runners also reported to plaintiff. By the time the items were handled in shipping, the stain or other chemicals used on the products were dry.
6. The chemicals used in the defendant's facility were primarily used in the finishing process, which was not part of plaintiff's job. Plaintiff was not able to identify the cause of her alleged exposure other than that there were chemicals used in defendant's facility. Plaintiff *Page 4 
could not identify which chemical she felt she was in contact with or which chemical caused her symptoms. Plaintiff further testified that she did not have chemicals sprayed, splattered, or spilled on her.
7. The chemicals used in defendant's facility were stored in an access restricted storage building outside of the facility. The chemicals are then placed in pump rooms in smaller quantities outside the facility. Plaintiff did not have access to nor was plaintiff expected to be in the pump rooms. There is no evidence of any chemical spills in the facility during plaintiff's employment with defendant.
8. In October 2001, plaintiff obtained a leave of absence and short-term disability benefits due to viral upper respiratory infection, bronchitis and dehydration. Her family physician, Dr. Rupert Jilcott, indicated that this was only indirectly work related in that stress and fatigue from her job played a role. On November 5, 2001 through November 7, 2001, plaintiff was admitted to the hospital with pneumonitis.
9. In December 2002, plaintiff obtained a leave of absence and short-term disability benefits due to pneumonia. Dr. Jilcott indicated and plaintiff acknowledged that the condition was not work related.
8. On December 29, 2002, at the request of Dr. Teigha Randolph, plaintiff began treating with Dr. Robert Gallaher, who is Board Certified by the American Board of Internal Medicine, and the American Board of Pulmonary Diseases and Critical Care and is a Diplomat and Fellow of the American College of Chest Physicians and the American College of Physicians. At that time, plaintiff gave Dr. Gallaher a history in which she indicated that she had no recollection of being exposed to any toxic materials at work. Dr. Gallaher was most concerned with plaintiff's cigarette smoking and believed that smoking was contributing to her *Page 5 
symptoms of shortness of breath and coughing. Dr. Gallaher indicated that smoking makes one more susceptible to respiratory tract infections, and plaintiff's smoking could contribute very heavily to her episodes of shortness of breath and cough.
8. Dr. Gallaher believed that plaintiff suffered from gastroesophageal reflux disease (GERD) with chronic aspiration and that this in turn was causing a perpetual amount of recalcitrant bronchospasm. Dr. Gallaher also found that plaintiff had symptoms of nocturnal wheezing and indigestion and that GERD can cause nocturnal brochospasm.
9. During Dr. Gallaher's treatment of plaintiff in December 2002, Dr. Gallaher diagnosed plaintiff with pneumonia but was unable to state whether the pneumonia was due to a bacterial infection or a viral infection. Plaintiff was ultimately diagnosed in August 2003 with grade I severity esophagitis and erosive duodenitis changes by Dr. Jamie Kroeger. Dr. Gallaher indicated in his deposition testimony that Dr. Kroeger's diagnosis confirmed his suspicion that plaintiff suffered from GERD. *Page 6 
10. On February 20, 2003, plaintiff treated with Dr. Gallaher again. At that visit, plaintiff weighed approximately 220 pounds and plaintiff reported she was having difficulty with wheezing, shortness of breath and waking up at night. Dr. Gallaher characterized plaintiff as heavy and indicated that dyspnea and shortness of breath can be caused by excessive weight. Dr. Gallaher also indicated that plaintiff was down from two packs of cigarettes per day to ¾ of a pack per day.
11. On March 6, 2003, plaintiff treated with Dr. Gallaher at which time plaintiff was smoking approximately one pack of cigarettes per day and still complaining of shortness of breath and coughing. Dr. Gallaher informed plaintiff there was little he could do if she did not stop smoking.
12. On March 18, 2003, plaintiff resigned from her employment with defendant indicating that she had chosen to further her career in a different arena. Plaintiff returned to work for Lowe's following her resignation with defendant.
13. On June 20, 2003, at the recommendation of Dr. Gallaher, plaintiff had a CT scan of her lungs that showed, among other things, unchanged emphysema of the superior segment left lower lobe. According to Dr. Gallaher this basically means that the CT scan showed altered lung anatomy. These changes were described radiographically as emphazematic changes. In Dr. Gallaher's opinion, plaintiff's smoking probably contributed to some of her emphazematic changes.
14. In July 2003, Dr. Gallaher saw plaintiff two times. At the earlier July visit plaintiff was still smoking a pack of cigarettes per day. By the end of July 2003 plaintiff had just stopped smoking. *Page 7 
15. In August 2003, Dr. Joseph Whitlark performed a wedge biopsy of the left lung upper lobe and a level 4 lymph node biopsy. The lung biopsies showed the presence of bronchiolitis obliterans with organizing pneumonia ("BOOP") and changes of lipoid pneumonia. The tissue slides were then submitted to Dr. Myers and Dr. Tazelaar at the Mayo Clinic in Rochester, Minnesota as pathologists having special expertise in pulmonary pathology. The Mayo Clinic physicians found that plaintiff's biopsy showed an organizing endogenous lipoid pneumonia occurring in association with chronic bronchiolitis and bronchiolectasis with mucus stasis. Exogenous lipid was not identified. This finding was contrary to Dr. Bown's opinion that plaintiff's pneumonia was exogenous.
16. Dr. Gallaher indicated that BOOP does show up on CT scans and that BOOP did not appear on plaintiff's June 20, 2003 CT scan. BOOP did not appear until August 2003. Therefore, the BOOP did not occur until after June 20, 2003 and sometime prior to August 6, 2003. Plaintiff's resignation from defendant was approximately three months before the June 2003 CT scan which did not show BOOP and five months before the August 2003 tests when BOOP was found.
17. Plaintiff alleges an injury date of September 26, 2003, approximately six months after her employment with defendant ended. However, she had at least one incident of pneumonia while working for Lowe's and before going to work for defendant.
18. On December 30, 2003, plaintiff requested from defendant the Material Safety Data Sheets for all chemicals used by defendant from March 6, 2000 through March 18, 2003. Defendant provided the MSD sheets requested by plaintiff but noted that her job as a Shipping Department Supervisor did not require that she use or work with any of the chemicals. *Page 8 
19. On September 23, 2004, plaintiff began treating with Dr. Brown, who is board certified in internal medicine. Dr. Brown diagnosed plaintiff with BOOP secondary to lipoid pneumonia. Dr. Brown testified that plaintiff's disease is extremely rare, and there have been approximately ten cases reported worldwide since 1955.
20. Dr. Brown indicated through deposition testimony that there are two types of lipoid pneumonia: exogenous lipoid pneumonia and endogenous lipoid pneumonia. Endogenous means that the lipid was created within the body. Exogenous means the lipid entered into the body from outside. Dr. Brown diagnosed plaintiff with exogenous lipoid pneumonia, meaning the lipid came from outside of her body.
21. Although Dr. Brown had not identified the specific lipid causing the pneumonia, she suspected that plaintiff was exposed to aerosolized lipids from furniture polish that would have been sprayed on furniture and aerosolized in the air. However, Dr. Brown erroneously believed that plaintiff was involved in the finishing, varnishing or polishing of furniture. Dr. Brown never visited the facility where plaintiff worked. Dr. Brown was not aware that plaintiff was a supervisor in the shipping department and that plaintiff's job as a shipping supervisor did not involve furniture finishing or spraying furniture polish. Plaintiff was never employed by defendant in the finishing department. Dr. Brown was not aware that plaintiff was not a sprayer and that plaintiff had a separately enclosed, climate controlled office. Additionally, Dr. Brown was not acquainted with the setup or ventilation in the shipping department.
22. Dr. Brown never identified any specific substance or lipid causing the lipoid pneumonia in plaintiff's workplace with defendant that was the cause of plaintiff's problems. Plaintiff never identified for Dr. Brown any of the items in the MSD sheets that she worked with. Dr. Brown reviewed the MSD sheets provided by defendant at plaintiff's request but was unable *Page 9 
to understand or interpret the MSD sheets. Dr. Brown has no information as to which particular chemicals plaintiff may have been exposed to at defendant's facility or at what level of exposure. Dr. Brown did not conduct or request any pathology tests on tissue samples from plaintiff to test for any of the chemicals shown in the MSD sheets.
23. Dr. Brown testified that plaintiff's condition had to be caused by an oil mist with a particle size of 2.5 micrometers or less in order for the particles to get far down into plaintiff's lungs. Dr. Brown had no information indicating that the required size particle was present at defendant's facility.
24. Although Dr. Brown did not have knowledge of the air quality in defendant's facility, the air quality monitoring in defendant's finishing department at the time of plaintiff's resignation showed air quality levels well within OSHA standards. Dr. Brown had no information with respect to quantities of chemicals in the air or what level of exposure plaintiff may have experienced to any chemicals at defendant's facility. Similarly, Dr. Brown did not ask plaintiff about chemicals and oils in use at her home or in her everyday life.
25. Dr. Brown indicated that there are other potential causes of plaintiff's BOOP and lipoid pneumonia. According to Dr. Brown, it is possible that the oil or lipid causing plaintiff's BOOP secondary to lipoid pneumonia could have come from a paint exposure at Lowes. Dr. Brown never asked for the MSD sheets pertaining to plaintiff's employment at Lowes. It is also possible that plaintiff was exposed to lipids causing her condition through cigarette smoke. Plaintiff also has moderate obstructive lung disease based at least in part on her smoking.
26. In formulating an opinion, Dr. Brown did not review the records from plaintiff's long-term family physician, Dr. Jilcott or from her pulmonologist, Dr. Gallaher. Dr. Brown was not aware that plaintiff had suffered from pneumonia before working for defendant. *Page 10 
27. Dr. Brown indicated in his deposition testimony that plaintiff's lipoid pneumonia was cured and that plaintiff had not had a recurrence of the BOOP since December 2004. According to Dr. Brown, plaintiff is still not able to work eight straight hours because she gets worn out but does not know why.
28. The undersigned find that there is insufficient evidence to prove that BOOP secondary to lipoid pneumonia is characteristic of those employed in the cabinet or furniture manufacturing industry as plaintiff was.
29. The undersigned give greater weight to medical evidence provided by Dr. Gallaher, Dr. Jillcott, and the Mayo Clinic.
30. Although Dr. Brown testified that plaintiff's BOOP and lipoid pneumonia were caused by plaintiff's exposure to chemicals while at work, the greater weight of the medical evidence shows there is not a causal connection between plaintiff's conditions and plaintiff's work for defendant.
 * * * * * * * * * * * CONCLUSIONS OF LAW
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following: *Page 11 
1. Plaintiff's condition is not characteristic of persons engaged in her particular trade or occupation and is not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade. Plaintiff has failed to establish a causal connection between her condition and her employment with defendant.Rutledge v. Tulex Corp., 308 N.C. 85, 301 S.E. 2d 359 (1983);Cialino v. Wal-mart Stores, 156 N. C App. 463, 577 S. E. 2d 345 (2003).
2. Plaintiff is not disabled due to a compensable occupational disease caused by her employment with defendant. N.C. Gen. Stat. §§ 97-52; 97-53.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the undersigned enters the following:
 AWARD
1. Plaintiff's request for disability benefits is DENIED.
2. Plaintiff's request for medical expenses for medical treatment and future medical compensation is DENIED.
This the 14th day of March, 2007.
 S/_______________________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/_______________________ DIANNE C. SELLERS COMMISSIONER *Page 12 
 S/_______________________ LAURA K. MAVRETIC COMMISSIONER *Page 1